IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | 8:13CR73 |
| v. | ) | |
| | ) | **MEMORANDUM** |
| BRYAN HOWARD, | ) | **AND ORDER** |
| Defendant. | ) | |

In 2014, subsequent to the execution of plea agreements and pleas of guilty, Bryan Howard was convicted, together with his girlfriend, Jessica Kraft, of conspiracy to possess with intent to distribute methamphetamine. I sentenced him to 10 years in prison. Filing no. 153.

While in prison, Howard submitted two motions for return of seized property. Filing no. 173; Filing no. 174. He remains in prison now.

After he filed the motions, which I construed to have been filed under Rule 41(g) of the Federal Rules of Criminal Procedure, I ordered the government to respond, and it did by submitting a response, Filing no. 176, and an index of evidence, Filing no. 177, consisting of five exhibits. I then appointed Federal Public Defender David Stickman to represent Howard. Filing no. 178. Despite the fact that I had appointed counsel for him, Howard, proceeding pro se, filed a brief, Filing no. 179, and an affidavit, Filing no. 179-1.[1]

I then conferred with counsel and gave counsel for both sides the opportunity to submit additional briefs and affidavits, and they did. The government submitted

---

[1] Howard later filed a frivolous motion for new counsel when Mr. Stickman refused to raise an obviously frivolous claim. Filing no. 194; Filing no. 195.

extensive evidence, including multiple affidavits of law-enforcement officers who had been involved in this case. Filing no. 184 and Exhibits 1-13. The government also filed two additional responses. Filing no. 183; Filing no. 196. Howard submitted an additional affidavit after the government's last evidentiary submission, this time through his appointed counsel. Filing no. 192. Howard also filed a response signed by his appointed counsel. Filing no. 191.

On September 17, 2019, I again conferred with counsel. I asked counsel whether they objected to me taking judicial notice of everything in the court file, and neither side objected, so I now do so.

I also queried counsel on the facts and the law, and counsel responded. The government argued that no evidentiary hearing was necessary, and the motions should be denied on their merits.[2] In contrast, Mr. Stickman, on behalf of Howard, argued that an evidentiary hearing was necessary before I made a decision.

Filing no. 184-10 contains a helpful chart listing all of the items at issue. Also, the chart uses columns to show the government's position as to each item. As I refer to this document throughout, and it is difficult to replicate, I attach a copy of that document to this opinion and incorporate the contents herein. Before proceeding further, the reader is well advised to examine that attachment.

Having concluded that Howard has been heard fully and that an evidentiary hearing is unnecessary and legally unwarranted,[3] I now deny Howard's motions. I do so for the reasons set forth below.

---

[2] The government does not assert that the statute of limitations has run.

[3] "The court should afford the movant an opportunity to meet this burden, which may include, but does not require, an evidentiary hearing." *Jackson v. United States*, 526 F.3d 394, 396 (8th Cir. 2008).

*Background*

The following background is largely derived from the undisputed revised presentence report of Howard. Filing no. 147. Additional background is taken from Ms. Kraft's undisputed revised presentence report. Filing no. 134. This detail is provided because later I will need to discuss the concepts of "unclean hands" and "derivative contraband." The information that follows will be helpful to that discussion. This detail will also be useful when discussing Howard's claims more generally.

Howard was a fairly big player in the high-quality methamphetamine business. He used Ms. Kraft to help him carry out his business. In so doing, the two attracted the attention of the Sarpy County Sheriff's Office ("SCSO").

On September 26, 2012, Howard was arrested on local related charges. He posted bond on the related charge on October 1, 2012. On February 20, 2013, a one-count federal indictment was filed in the District of Nebraska, which charged that between August 1, 2012, and September 26, 2012, the Defendant conspired with others to distribute and possess with intent to distribute 50 grams or more of methamphetamine (actual), in violation of 21 U.S.C. §§ 841(a)(1) and 846. The indictment also included a forfeiture allegation, which included (a) a 2012 Harley Davidson Motorcycle, VIN 1HD1FBM13CB649297; (b) a 2006 GMC Sierra, VIN 2GTEK63N561324987; (c) a 2011 Interstate Kingman Cargo Trailer VIN 4RACS16256K015965; (d) $3,320 in U.S. Currency; (e) $2,740 in U.S. Currency; and (f) $3,681 in U.S. Currency.

On August 21, 2012, a confidential informant set up a methamphetamine buy from a methamphetamine source (hereinafter "CS"). However, en route to the meeting location, law enforcement pulled CS over. CS consented to a vehicle search. Officers found drug paraphernalia and approximately 28.3 grams of methamphetamine with

varying purities. Laboratory tests reflected 2.5 grams of 95% pure methamphetamine (2.375 grams actual), 2.2 grams of 65% pure methamphetamine (1.43 grams actual), 3.4 grams of 75% pure methamphetamine (2.55 grams actual), and 20.2 grams of 55% pure methamphetamine (11.11 grams actual).

CS was transported to the Sheriff's office where CS consented to an interview. CS stated that he/she was on his/her way to meet his/her friend to sell him meth. CS said that he/she owed his/her supplier $1,400 for the 28 grams of meth. When asked the names of his/her supplier, CS stated Bryan and Jess. CS stated he/she met Bryan five months prior and then later met his girlfriend, Jess. CS stated that Jess keeps a log of who owes them money for drugs and Jess is usually the person CS goes to in order to buy the meth after setting up the deal with Bryan. CS admitted to buying one gram from them two to three times, seven grams on ten occasions, 14 grams on one occasion, and one ounce only one time, which was the day prior. CS stated that the ounce he/she was arrested with was the ounce that he/she had gotten the day prior. CS stated he/she met Jess at the Dollar General parking lot at 90th and Maple Streets the previous night, and that CS had set up the deal by calling Bryan on the phone. Jess was identified as Jessica Kraft and Bryan as Bryan Howard.

CS stated he/she could set up a purchase of methamphetamine from Kraft and Howard. CS owed Howard and Kraft $1,400 for the meth that was fronted. CS could get another ounce if he/she paid the $1,400 for the last fronted ounce. CS then made a recorded call to Howard and Kraft. Kraft told CS that they could meet at the QT gas station at 108th and L Streets. Kraft later told CS that there were police around so she was moving to the Burger King parking lot. Surveillance officers at the QT saw a dark-colored Chevy Tahoe with NE plates SXF 215 leave the parking lot and relocate to the Burger King. The driver was a female with long blond hair. The vehicle was registered to Jessica L. Kraft of 512 North 85th Street, Omaha, NE.

The CS was given $1,400 in buy money. The CS drove to the Burger King parking lot located at 108th and Mockingbird Streets and parked next to the Tahoe. The CS walked up to the driver's-side window of the Tahoe and met with the female driver. CS got back in his/her car and drove to meet with law enforcement. The CS turned over a Burger King paper sack. The sack contained a clear plastic bag with a substance consistent with meth. Laboratory reports reflected that the substance was 27.7 grams of 85% pure methamphetamine (23.545 grams actual).

On August 23, 2012, the CS reported that he/she could get another ounce if he/she paid the $1,400 for the last fronted ounce. The CS first called Kraft, but Kraft said to call Howard. The CS called Howard and told Howard that the CS owed Kraft money and wanted to repay it and get another one, meaning another ounce of meth. Howard stated, "well, you've always owed me." Howard agreed to meet the CS at 90th and L Streets.

Law enforcement followed the CS to the Time Clock Lounge located at 4601 South 90th Street, Omaha, NE. The CS parked in the parking lot and a few minutes later, a male on a motorcycle, later identified as Bryan Howard, pulled up next to the CS. The CS and the male exchanged something through CS's driver-side window. Howard then left the parking lot. Law enforcement found that the motorcycle was registered to Bryan R. Howard and Jessica L. Kraft at 512 North 85th Street, Omaha, NE. After the transaction, law enforcement seized a substance consistent with methamphetamine from CS. Laboratory reports revealed that the substance purchased from Howard was 26.4 grams of 95% pure methamphetamine (25.08 grams actual).

On August 28, 2012, CS contacted Kraft and Howard via text message to arrange another meth buy. CS then went to Harrah's Casino to meet with Kraft. Upon arriving at the casino, surveillance officers saw Kraft's vehicle in the parking lot. CS parked his/her vehicle in the same area. Surveillance officers saw Kraft walking a dog near the front of the casino. Kraft met with CS in the parking lot, and then they both

walked into the casino. Surveillance watched them enter Room 303. While Kraft and CS were in the room, surveillance officers could hear, via the transmitter on CS, Kraft and CS discussing money. CS and Kraft exited the casino approximately one hour later and left in their respective vehicles.

CS then met with law enforcement and turned over a substance that was consistent with methamphetamine. Laboratory tests revealed that the substance was in fact 26.7 grams of 80% pure methamphetamine (21.36 grams actual). CS stated upon arrival in the parking lot of the casino that CS sent Kraft a text message. Kraft then met CS in the parking lot. Kraft had her pit bull named Harley with her. From the lot, CS accompanied Kraft and her dog to room 303. Inside, Kraft and the CS talked about a number of things, including Kraft having been the victim of an armed robbery. Kraft stated that she was robbed of five ounces of meth and a little money. When CS asked Kraft about protecting herself, Kraft told CS that she had a shotgun and a handgun. At one point during the meeting between CS and Kraft, the CS paid Kraft $2,000 (which included the $600 that CS shorted Howard on August 23, 2012). Before Kraft and CS exited the room, Kraft retrieved approximately one ounce of methamphetamine from a dresser drawer, weighed the substance, put it in a plastic bag, and gave it to CS.

In the morning of September 4, 2012, CS sent Kraft a text message to let her know that the CS would contact Kraft when CS had all the money that CS owed for the methamphetamine that Kraft fronted on August 28, 2012. CS also received a text message from Howard, who asked if CS had an IPad that Howard could buy. CS said he/she did not, but would look around for one. Later that day, at approximately 8:51 p.m., law enforcement directed CS to send Kraft a text message, "What's Up?" Approximately 15 minutes later, Kraft responded, "I'm at the house you can come here." CS was directed to respond "K. Be there soon. How long will you be there." Kraft responded that she was hoping to get out of here soon—going to hotel to take a shower and meet a friend.

After being equipped with a recording device and $1,400 in buy money, CS drove to Kraft's residence and entered through the front door. Approximately 15 minutes later, CS and Kraft exited the residence and departed in separate vehicles. CS met with law enforcement and stated that when CS arrived at the residence, CS sent a text message to Kraft, announcing CS's arrival. CS then walked to the front door and was let into the residence by Kraft. Kraft and CS met in the dining room area. Kraft went to the bathroom and returned to the dining room. CS gave Kraft $1,400, which Kraft counted. Kraft then slid an ounce of methamphetamine across the dining-room table to CS. Kraft told CS that she was going to Harrah's to meet a friend. Kraft also stated she was staying in Room 301. CS and Kraft then exited the residence. CS turned over to law enforcement a substance consistent with methamphetamine. Laboratory tests confirmed that the substance was in fact 26.9 grams of 95% pure methamphetamine (25.555 grams actual).

On September 18, 2012, CS informed law enforcement that he/she had been in contact with Jessica Kraft. CS stated he/she owed Kraft and Howard $1,400 for the ounce CS got on September 4th, and that CS would be able to get fronted another ounce of meth. CS sent a text message to Howard stating, "Hey lost Jesses new number she gave me but I have what I owe if u could have her text me." CS then made a recorded call to Howard during which Howard stated, "she said she tried to call you." Howard then said, "she just took off, she's got it." CS asked Howard if he meant Jess, and he said, "yes." CS told Howard she would be going to Big Red Keno and "I have what I owe her and I've been trying to get a hold of one of you to make sure I'm good." Howard asked, "are you gonna need to get, need to get more?" CS said "yes" and Howard then told the CS, "I'll have her call you."

Approximately an hour later, CS received a text message stating, "Hey what's up this is jess b said 4 me to get a hold of u." CS responded, "sorry lost ur number ben tryin to reach u. u gonna be around?" Kraft responded, "I can meet u at big red keno b said u had to go there right." CS responded, "yea ill b leavin in a min to take her but

if ur gana be home I can walk over cuz Niccis bein a bitch." Kraft responded, "im not there at the moment but should be shortly." Approximately 15 minutes later, Kraft again texted the CS stating, "on way back to house do I have a min to run into store for 2 things I need to make dinner or r u in a hurry."

CS was given $1,400 in buy money and then walked to 512 North 85th Street. Surveillance officers observed CS enter the front door. Approximately 1 1/2 hours later, CS exited and was picked up by law enforcement. CS stated that Kraft was the only person inside the residence and that Kraft got the meth out of a metal file-cabinet-type unit that was on the table where she was sitting. CS stated Kraft scooped the meth out of a big Tupperware-type container with a cup-like dish. CS stated that Kraft had another estimated three ounces in the container.

CS stated that there were two handguns, a revolver, and a small black handgun on the kitchen table right next to Kraft. CS handed over to law enforcement a clear plastic bag that contained a substance consistent with methamphetamine. Subsequent laboratory reports confirmed that the substance was in fact 26.7 grams of 90% pure methamphetamine (24.03 grams actual).

On September 25, 2012, surveillance officers determined that Kraft was staying at the La Quinta Inn, located at 10760 M Street in Omaha. At approximately 10:00 p.m., CS met with law enforcement to discuss conducting a controlled purchase from Kraft. CS then walked from Bucky Gas Station located at 108th and M Streets to the La Quinta Inn to meet with Kraft. Approximately 30 minutes later, CS exited the motel and met with law enforcement.

CS stated that upon arrival on the south side of the La Quinta, the CS noticed someone sitting in a white truck. As CS approached an entrance to the hotel, CS crossed paths with a white male who told CS, "I left the door open for you." CS met with Kraft in room 234.

While inside the room, CS saw Kraft give a white male named "Josh" a plastic bag containing methamphetamine. CS paid Kraft $1,400, and Kraft retrieved a plastic bag containing one ounce of methamphetamine from inside or underneath a cooler in the room. Laboratory tests revealed that the substance CS obtained from Kraft was in fact 28.0 grams of 90% methamphetamine (25.2 grams actual).

On September 26, 2012, law-enforcement officers applied for and were granted a search warrant from the County Court of Sarpy County, Nebraska,[4] to search Room 234 at the La Quinta Inn. During the search, officers found several bags containing methamphetamine, drug paraphernalia, and $3,681 in U.S. currency. A laboratory report reflects that 106.1 grams of 95% pure methamphetamine (100.795 grams actual) and 7.1 grams of 90% pure methamphetamine (6.39 grams actual) were seized. Kraft was also arrested at the scene and invoked her rights.

There is little doubt that Howard was, relatively speaking, a "heavy hitter" when it came to the sale of high-quality methamphetamine. In addition to the facts shown by the foregoing, it is undisputed that Howard demonstrated an ability to access pound quantities of methamphetamine from his supplier, and at least one pound was actually obtained. Filing no. 146 (sealed).

Because Kraft was held responsible for possessing at least four handguns, she was not eligible for the safety-valve even though she had no criminal history. Those four guns were in addition to the shotgun Kraft told CS she had for protection against being robbed of her drug money again.

It is also clear that Howard controlled Kraft in whole or in part to further the conspiracy. Indeed, because the investigators determined that Howard ran the

---

[4] A Sarpy County judge also issued other search warrants. All of the search warrants may be found at Filing no. 177.

operation, had the connections for acquisition of the drugs, and directed Kraft's actions, Kraft received a two-level downward role adjustment. Howard and Kraft lived with each other from time to time. As Howard later put it in an affidavit to me, "Jessica and I did business together legal and otherwise." (Filing no. 192 at CM/ECF p. 3.)

Prior to the time that Howard committed the offense in question, he had been convicted of at least three felony offenses. He had been convicted of forgery, possession or receipt of a stolen firearm, and terroristic threats. He had also been convicted of an extremely nasty domestic assault. He served time in prison on several occasions. Insofar as the guns were concerned, Howard was a prohibited person during the entirety of the conspiracy. He thus had every reason to use Kraft to protect the drug proceeds with the four handguns and shotgun but stay away from the guns himself.

### *What Is Not At Issue*

Howard does not (and could not) seek the return of items forfeited by his plea agreement. Filing no. 179. (The final forfeiture order appears at Filing no. 152.) Nor does he seek the return of drug paraphernalia or controlled substances. *Id.* This means that Howard does not have any right, title, or interest in the items listed as "Contraband" at Filing no. 184-10 or in the property listed as "Forfeited" at Filing no. 184-10. Additionally, it is undisputed that the government has returned to Howard or his nominee the various items listed as "Delivered to Defendant or Agent" at Filing no. 184-10. These items included collectible $1.00 bills, a coin collection in a white box, a coin collection in a Blue-ray box, and a Sharp flat-screen television.

### *The Government No Longer Has Control Of Most If Not All of the Items*

The government represents that it no longer has control of most if not all of the items listed on Filing no. 184-10 that Howard seeks. They have been destroyed,

disposed of, and in the case of the stolen all-terrain vehicles, returned to their rightful owners or auctioned pursuant to the laws of the State of Nebraska. See, for example, Filing no. 184-2.

This, however, does not moot the matter insofar as the United States is concerned. While Federal Rule of Criminal Procedure 41(g) is no longer directly in play because most if not all of the property is gone and the government has not waived sovereign immunity for monetary damages under the rule, Howard could conceivably make a claim for money damages under a variety of other theories. *See, e.g., Jackson,* 526 F.3d at 998; *United States v. Hall,* 269 F.3d 940, 943 (8th Cir. 2001). However, under Rule 41(g), the case law instructs that I must retain, and am now required to exercise, my equitable jurisdiction to determine whether such alternative claims are cognizable. *Hall,* 269 F.3d at 943. I proceed to that task next.

In doing so, I make no determination that the Federal Public Defender, Mr. Stickman, would be authorized to pursue a cognizable *monetary* claim on behalf of Howard. Indeed, that would seem to improperly expand the reach of the Criminal Justice Act. 18 U.S.C. § 3006A(a)(1) & (2); *cf. Froudi v. United States,* 23 Cl. Ct. 328, 329 (1991) (DEA sold Froudi's Mercedes-Benz automobile and $600 lizard-skin briefcase seized by state authorities and used in state drug prosecution; "Mr. Froudi is the plaintiff here, not a defendant in need of the legal representation contemplated by 18 U.S.C. § 3006A. We conclude, therefore, that said section has no application here, in that it does not permit this court to appoint counsel for Mr. Froudi.").

### *The Venue Items*

Howard has no viable alternative monetary damage claim to the venue items described at Filing no. 184-10 either because they did not belong to him[5] or because

---

[5]For example, "Venue item – vehicle registration [Jessica Kraft]."

they have no value. Neither of his affidavits suggest that these venue items are worth even a penny. *See* Filing no. 179-1; Filing no. 192. Thus, Howard has suffered no damages for any of the venue items that were destroyed. Since proof of damages would obviously be required under *Bivens* or the various statutory theories of recovery that might be available to him, Howard has no cognizable claim whatever regarding these items.

### *The Firearms and Ammunition*

Howard's affidavits do not make an explicit claim that he owned or had some interest in the firearms and ammunition, although he suggests they could have been transferred to a third party on his behalf and presumably sold for his pecuniary benefit under the Supreme Court's holding in *Henderson v. United States*, 135 S. Ct. 1780, 1786 (2015) (court considering felon's motion for return of firearms that he surrendered *after* arrest and *as bond condition* on felony drug charges could approve proposed transfer of firearms to third-party purchaser if, but only if, such disposition prevented felon from later exercising control over firearms). *See also United States v. Henderson*, 555 F. App'x 851, 852 (11th Cir. 2014), judgment vacated by *Henderson*, 135 S. Ct. 1780 (regarding surrender of guns to obtain pretrial release).

First, Howard has not made an explicit claim under oath the he had some ownership interest in the weapons or ammunition.[6] The presentence report shows that Kraft, as part of the conspiracy with Howard, used four handguns to further the drug enterprise. Furthermore, as recited in the presentence report, Kraft told CS that she used a handgun and the shotgun to protect the drug proceeds that she and Howard enjoyed as part of their conspiracy after she had been robbed at gun point. Absent an

---

[6] One can only speculate why Howard fails to make an explicit claim of an ownership interest under oath. Perhaps his classification as a prohibited person during the conspiracy plays some part. In any event, his cagey pro se affidavit is insufficient. Filing no. 179-1. On the other hand, it is noteworthy that the affidavit prepared with the assistance of counsel is silent on the matter. Filing no. 192.

explicit claim that Howard, a thrice-convicted felon, somehow acquired an interest in these items, there is simply no evidentiary basis for concluding that he has a damage claim for the disposal of them.

Second, the *Henderson* Court made clear that "Henderson's felony conviction had nothing to do with his firearms, so the unclean hands rule has no role to play here." *Henderson*, 135 S. Ct. at 1783 n.1. *But* the Court cautioned: "The unclean hands doctrine proscribes equitable relief when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.' *The doctrine might apply, for example, if a felon requests the return or transfer of property used in furtherance of his offense.*" *Id*. (citation omitted; emphasis added). That is precisely the situation here.

Thus, I find and conclude that Howard can make no monetary claim for the weapons or ammunition as his "hands are unclean"—the guns and ammunition were used by his coconspirator (and puppet) to further *his* illegal activity. *See also United States v. Zackery*, 494 F.3d 644, 646 (8th Cir. 2007) (under the *Pinkerton* theory of liability, a defendant may be convicted of the use of a firearm in furtherance of a crime when *another* conspirator actually used a firearm to commit a crime if the defendant could reasonably have foreseen that a firearm would be used to commit that crime as a necessary or natural consequence of the conspiracy). In short, Howard has no cognizable monetary claim regarding the disposal of the guns and ammunition because they were used in a conspiracy which he headed up and profited from and their use was reasonably foreseeable to him.

### *The All-Terrain Vehicles ("ATVs")*

Howard denies that he stole the ATVs. But he does not dispute that they were stolen. Furthermore, and far more importantly, there is no evidence that the federal government, as contrasted with the state authorities, had any interest in, or control

-13-

(whether actual or constructive) over the ATVs. They were not seized for purposes of proving the drug conspiracy, and to the extent that any law-enforcement authority exercised any type of control over them, it was the SCSO.

To be specific, the undisputed evidence establishes that the ATVs, found stored in a trailer registered to Kraft, were seized by the state authorities because they believed they were stolen and not to further the drug investigation. Filing no. [184-5 at CM/ECF p. 2](#) ¶ 6 (affidavit of SCSO narcotics investigator and supervisor Dan Voss). Two of the ATVs were returned to the owners and the third auctioned pursuant to state law. Filing no. [184-1](#) (affidavit of Peggy Buchannan, SCSO administrative deputy sheriff).

Rule 41(g) could *never have* provided Howard with relief insofar as the ATVs are concerned because the federal government did not exercise any type of control over them. *See*, *e.g*, *[United States v. Copeman](#)*, 458 F.3d 1070, 1072 (10th Cir. 2006) (motion under Rule 41(g) would not lie for return of seized property that had been continuously in custody of state law-enforcement authorities and was not used or considered as potential evidence in defendant's federal gun and drug prosecution). Therefore, Howard has no cognizable claim for monetary damages regarding the ATVs.

### *Derivative Contraband—Mainly the Video Equipment*

There is a doctrine closely related to the doctrine of "unclean hands." It is called "derivative contraband."

The United States Court of Appeals for the Eighth Circuit has recognized that a drug dealer may be divested of "derivative contraband" even where there has been no forfeiture action commenced:

> Federal law provides a vehicle for the government to prevent a person from regaining possession of items associated with criminal activity. Pursuant to federal asset forfeiture laws, the government may pursue a forfeiture action against any item used or intended for use to manufacture, contain, or transport controlled substances. *See* 21 U.S.C. § 881(a). The government failed to initiate an enforcement action in this case. We believe, however, that such a failure should not prevent the government from being able to assert, in resistance to a Rule 41[(g)] motion, a limited derivative contraband theory, i.e., that the items sought to be returned were in fact utilized or intended to be utilized by the person who possessed them for the manufacture, storage, or transportation of controlled substances. We agree with the district court that it makes scant sense to return to a convicted drug dealer the tainted tools used or intended to be used in his illegal trade when the same were lawfully seized.

United States v. Felici, 208 F.3d 667, 671 (8th Cir. 2000), *abrogated in non-pertinent part by* Henderson, 135 S. Ct. 1780. *See also* United States v. Kaczynski, 551 F.3d 1120, 1130 (9th Cir. 2009) ("Thus, even if the items sought to be returned could somehow be construed as innocent in and of themselves, the motion could be denied if such items had been utilized or intended to be utilized for illegal purposes.").

I believe that the foregoing doctrine from *Felici* applies. It renders Howard's claims regarding the items, particularly the video equipment, listed as derivative contraband on Filing no. 184-10 unavailing.[7] Essentially, the only items of value that need to be discussed in any detail under this doctrine pertain to the video-surveillance equipment. Other items (like scales, drug records, plastic bags, and the like) either have no value or are so obviously tainted tools used or intended to be used in Howard

---

[7]I exclude the guns and ammunition from the discussion of derivative contraband only because of my previous application of the doctrine of "unclean hands" to those items. But, frankly, the doctrine of "derivative contraband" is equally applicable to the guns and ammunition for essentially the same reasons as set forth in my application of the doctrine of "unclean hands."

-15-

and Kraft's illegal trade that it is obvious that Howard has no cognizable claim to them.

Despite being given several opportunities and plenty of time to submit *specific* affidavits regarding the video equipment, Howard's submissions create no factual dispute about whether the items listed as derivative contraband on Filing no. 184-10 were not in fact derivative contraband. Indeed, in his latest affidavit, *submitted after the government's evidentiary specification regarding derivative contraband*, Howard does not address that issue at all. As noted earlier, he admits in his own handwriting that "Jessica and I did business together legal and otherwise." (Filing no. 192 at CM/ECF p. 3.)

Contrast the unresponsive nature of Howard's affidavit with the affidavit of Mark Shiller, a law-enforcement officer with 28 years of experience and 13 years as a narcotics investigator. Filing no. 184-3. He swears that:

> Drug dealers often install and maintain exterior video surveillance equipment at locations that are used to store drugs, sell drugs and/or keep drug proceeds. Being able to see who is outside assists drug dealers by helping them to avoid being robbed. It also helps them avoid being caught by law enforcement with drugs in their possession.
>
> . . . .
>
> All of the items from Exhibit 1 that are categorized on Exhibit 5 as Derivative Contraband are items that were used or intended to be used in connection with the storage, transportation, distribution or use of controlled substances.

*Id.* at CM/ECF p. 2 ¶¶ 4 & 6.

In short, all the items categorized as derivative contraband were in fact derivative contraband. It is worth remembering that Kraft was robbed of drug money,

and both conspirators had strong motivations to safeguard the places they did business with video-surveillance equipment.[8] Howard, despite being given the opportunity to do so, has submitted no sworn affidavit to show otherwise.

### *Conclusion*

The government has amply rebutted any monetary claim that Howard could assert. Despite having counsel appointed for him and despite being given a full and fair opportunity to specifically respond to the detailed evidence submitted by the government, Howard has failed to do so. To be specific, and to avoid any uncertainty, I find and conclude that there is no material fact in dispute that is *genuinely* controverted. *See*, *e.g.* Federal Rule of Civil Procedure 56.[9]

For all the reasons articulated above,

IT IS ORDERED that:

1. The motions, Filing no. 173, Filing no. 174, for return of property, construed under Federal Rule of Criminal Procedure 41(g), are denied with prejudice.

2. To the extent that Howard has inchoate claims for monetary damages because the property he seeks is gone, those claims are denied and dismissed with prejudice.

---

[8] It is worth noting that Kraft was acutely sensitive to law-enforcement surveillance. For example, and as described earlier, Kraft told CS that they could meet at the QT gas station at 108th and L Streets. Kraft later told CS that there were police around, so she was moving to the Burger King parking lot.

[9] In circumstances such as this, some courts have suggested that the Federal Rules of Civil Procedure may be implicated.

3.  Judgment will be entered by separate document.

DATED this 25th day of September, 2019.

> BY THE COURT:
>
> s/ *Richard G. Kopf*
> Senior United States District Judge

| Location & Item No. | Description | Contraband | Derivative Contraband | Forfeited | Delivered to Defendant or Agent | Venue Items - Destroyed |
|---|---|---|---|---|---|---|
| **La Quinta Inn, 10760 M St., Room 234** | | | | | | |
| Motel 1 | Blue/black nylon bag | | X | | | |
| Motel 1A | Ziploc bag with approx. 2.5 oz. suspected meth | X | | | | |
| Motel 1B | Small Tupperware container containing suspected meth | X | | | | |
| Motel 1C | Misc. paraphernalia | X | | | | |
| Motel 1D | Black box with suspected drug records | | X | | | |
| Motel 1E | Maroon functioning digital scale | | X | | | |
| Motel 1F | Small Tupperware with suspected marijuana | X | | | | |
| Motel 1G | Small blue container with suspected meth | X | | | | |
| Motel 1H | Small Ziploc bags and box of sandwich bags | | X | | | |
| Motel 1I | $3,323.00 U.S. currency | | | X | | |
| Motel 2 | $358.00 U.S. currency | | | X | | |
| Motel 3 | Small Ziploc with suspected meth | X | | | | |
| Motel 4 | Venue item – vehicle registration [Jessica Kraft] | | | | | X |
| Motel 5 | Blue glass bong | X | | | | |
| **8953 J Street** | | | | | | |
| J Street 1 | Bersa .380 pistol, Ser# 270559, 7 rounds in clip | | X | | | |
| J Street 2 | Suspected drug packaging | | X | | | |
| J Street 3 | 93 Remington .380 rounds | | X | | | |
| J Street 4 | 43 Magtec .380 rounds | | X | | | |
| J Street 5 | Blue AWS functioning digital scale | | X | | | |
| J Street 6 | Samsung digital video recorder, S/N C81V6V2C301969T | | X | | | |
| **512 N. 85 St.** | | | | | | |
| Residence 1 | Collectible $1 bills | | | | X | |
| Residence 2 | Coin collection in white box | | | | X | |
| Residence 3 | Taurus PT740 .40 caliber pistol with mag & 5 rounds / SDT00605 | | X | | | |
| Residence 4 | 12 gauge shotgun loaded one round and Mossberg #500 | | X | | | |

**GOVERNMENT EXHIBIT 5**

| | | | | | | |
|---|---|---|---|---|---|---|
| Residence 5 | 3 shotgun shells on coffee table next to couch in LR | | X | | | |
| Residence 6 | Cash - $2,740.00 | | | X | | |
| Residence 7 | Suspected meth inside honey jar/6 grams | X | | | | |
| Residence 7A | 6 grams suspected meth | X | | | | |
| Residence 8 | .357 – 26 rounds, 15 gauge – 1,  .380 – 2 rounds | | X | | | |
| Residence 9 | 2 scales and plastic baggies, money bands | | X | | | |
| Residence 10 | Venue Bryan Howard – DOT paperwork | | | | | X |
| Residence 11 | 2 pistol holders | | X | | | |
| Residence 12 | Meth pipe - white | X | | | | |
| Residence 13 | Box 12 gauge shells, venue Bryan Howard | | X | | | |
| Residence 14 | Outside video cameras (3) | | X | | | |
| Residence 15 | Handheld camera control device | | X | | | |
| Residence 16 | Venue to Jessica Kraft and Bryan Howard, VISA card and photo | | | | | X |
| Residence 17 | .357 rounds | | X | | | |
| Residence 18 | Misc. keys | | | | | X |
| Residence 19 | Venue Jessica Kraft/Howard ID card, bank card | | | | | X |
| Residence 20 | Black notebook, drug records | | X | | | |
| Residence 21 | 2-shot Derringer/.357 #101542 loaded | | X | | | |
| Residence 22 | Suspected methamphetamine in plastic baggie | X | | | | |
| Residence 23 | Coin collection in Blue-ray box | | | | X | |
| Residence 24 | Flat screen TV, Sharp brand | | | | X | |
| Residence 25 | Hash (suspected) | X | | | | |
| Residence 26 | Cell phone – Verizon LG | | X | | | |
| Residence 27 | Notebook | | X | | | |